UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 06-CV-0359-CVE-SAJ |
| OKLAHOMA TRANSIT AUTHORITY, INC., GARY CUPPS and KAREN CUPPS, | ) ) ) | |
| Defendants and Third-Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| BOB TURNER and JOE WEST COMPANY, | ) ) | |
| Third-Party Defendants. | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Opposed Motion to Reconsider Defendants'
Motion to Amend Their Answer and File Counterclaims (Dkt. # 71); Defendants' Motion for Partial
Summary Judgment and Brief in Support (Dkt. # 73); and Plaintiff, Scottsdale Insurance Company,
Inc.'s, Motion for Summary Judgment and Brief in Support (Dkt. # 74).

## I.

On April 19, 2004, Oklahoma Transit Authority, Inc. ("OTA") was transporting Ruth Mae
Jones ("Jones"), a wheelchair bound patient, in a vehicle owned by OTA.  The driver, Michael
Whitecotton ("Whitecotton"), failed to ensure that Jones was wearing her seatbelt.  Whitecotton
missed his exit while traveling on Highway 75 near Mounds, Oklahoma.  Rather than proceed to the
next exit and turn around, Whitecotton  made a sudden stop that caused Jones to fall out of her

wheelchair.[1]  Jones was injured as a result of the fall and died 21 days later.  Scottsdale Insurance

Company ("Scottsdale") issued a business auto policy ("the Policy") to OTA and insured any

covered automobiles listed in the Policy declarations.  The declarations listed 25 covered

automobiles by vehicle type and vehicle identification number ("VIN").  Under the Policy, covered

automobiles were "[o]nly those 'autos' described in Item Three of the Declarations for which a

premium charge is shown."  Dkt. # 74, Ex. 4.  The vehicle involved in the accident had a VIN of

1FBSSILOXHA33514, but this vehicle was not listed as a covered automobile.  This vehicle was

not covered until the policy was amended on June 7, 2004, making coverage effective on May 20,

2004 for the vehicle involved in the April 19, 2004 accident.

In September 2005, an attorney representing Jones' estate advised Scottsdale that Jones'

family would be pursuing a wrongful death claim against OTA and other parties.  Scottsdale

initiated an investigation of the accident and determined that the vehicle was not a covered

automobile under the Policy.  However, the Policy contained a Uniform Motor Carrier Bodily Injury

and Property Damage Liability Insurance Endorsement, also known as a Form F endorsement

("Form F"), which provided:

> The certification of the policy, as proof of financial responsibility under the
> provisions of any State motor carrier law or regulations promulgated by any State
> Commission having jurisdiction with respect thereto, amends the policy to provide
> insurance for automobile bodily injury and property damage liability in accordance
> with the provisions of such law or regulations to the extent of the coverage and limits
> of liability required thereby; provided only that the insured agrees to reimburse the
> company for any payment made by the company which it would not have been
> obligated to make under the terms of this policy except by reason of the obligation
> assumed in making such certification.

---

[1]  Defendants argue that Jones refused to wear her seatbelt, and Jones was contributorily
negligent or assumed the risk of injury.

Id., Ex. 7.  Scottsdale claims that Form F obligated it to investigate and defend against any claims arising out of the accident even if the vehicle involved in the accident was not covered under the Policy.  However, Scottsdale argues that Form F entitles it to reimbursement from the insured for any liability incurred by Scottsdale arising solely under under Form F.

Gary and Karen Cupps are officers and directors of OTA.[2]  As of June 24, 2005, OTA was no longer a corporation in good standing under Oklahoma law, because Oklahoma's Secretary of State suspended OTA's certificate of incorporation "upon order of the Oklahoma Tax Commission for failure to comply with the requirements of the Oklahoma Tax Act."  Dkt. # 74, Ex. 10.  On November 17, 2005, an investigator hired by Scottsdale approached Karen Cupps and asked her to execute a non-waiver agreement concerning insurance coverage for the April 19, 2004 accident.  In the non-waiver agreement, Scottsdale reserved its right to refuse defense and indemnification under the Policy, because the vehicle involved in the accident "may not be covered under the policy."  Dkt. # 74, Ex. 8, at 1.  Paragraphs 4 and 5 of the non-waiver agreement state:

> 4.    It is the desire of the insured, notwithstanding the company's disclaimer of obligation under its said policy, that the company shall proceed with the investigation of said accident or loss, ascertaining of damages or amount of loss, negotiations for settlement of damage claims arising there from (if the company deems such negotiations advisable), defense of any suit or suits against the insured upon such claims for damages, appeal from any judgment or judgments rendered against the insured in such suit or suits -- any or all of such steps to be taken by the company without prejudice to the disclaimer of liability now asserted.

> 5.    In consideration whereof, the insured agrees that the insured will not hereafter assert any claim of waiver or estoppel against the company because of its investigation of the accident or loss, ascertaining of damages or amount of loss, negotiations for settlement, or defense of suit or suits against the

---

[2]    Gary Cupps is President of OTA, and Karen Cupps is Vice-President of OTA.  Dkt. # 91, Exs. 1, 2.

> insured; but that the company shall remain free at any time it may elect to discontinue such investigation, negotiations or defense and to insist upon its non-liability to the insured or others to perform any further services or pay any loss under the terms of said policy.

Id. Scottsdale asserts that Karen Cupps assumed personal liability, rather than an obligation on behalf of OTA, by executing the non-waiver agreement, because OTA's corporate status was under suspension. Karen Cupps claims that she signed the non-waiver agreement based on the representation of Scottsdale's investigator that the agreement was necessary for Scottsdale to continue its investigation of the claims against OTA, but she claims that she did not read the non-waiver agreement before she signed it. Dkt. # 91, Ex. 2.

Scottsdale sent a letter to Gary Cupps and OTA on December 1, 2005 advising them that the automobile involved in the April 19, 2004 accident was not covered under the Policy, but that Scottsdale may be obligated to pay Jones' estate's claim under Form F. Dkt. # 78, Ex. 3, at 3. Scottsdale also informed Gary Cupps that OTA, or its officers, would be obligated to reimburse Scottsdale for the amount of any settlement or judgment against OTA:

> The ultimate financial burden is yours. That being the case, you may want to consider paying this claim now, yourself. We reserve the right to dispose of the claims as we see fit. If you wish to be notified prior to any settlement, you must so advise in writing. If we do not receive any written notice, then we reserve the right to settle the claims without prior notice to you, at any time.

Id. at 4. On December 13, 2005, Scottsdale settled the claim against OTA and the Cupps for $250,000 after negotiations with Jones' estate, and the settlement agreement was executed on December 15, 2005.[3] It is not clear if Scottsdale notified Gary or Karen Cupps of the settlement

---

[3] The initial settlement demand by Jones' estate was $385,000 and Scottsdale responded with a counteroffer of $225,000. Id., Ex. 5, at 3. After further negotiations, Jones' estate agreed to accept $250,000 if Scottsdale could ensure that the settlement would be paid quickly. Id.

because, on December 15, 2005, Gary Cupps faxed a letter to OTA requesting that Scottsdale notify him of all settlement offers.

Defendants argue that Scottsdale's decision to settle for $250,000 was unreasonable, because Scottsdale's investigation uncovered evidence that Jones' death was not caused by the automobile accident.  Scottsdale's claims file shows that Jones' medical records were sent for a preliminary review by Deborah Mylius ("Mylius") at Vocational Diagnostics.  Mylius noted many risk factors that could have caused Jones' death, but she suggested that a chest injury caused by the accident could have accelerated her death.  Mylius asked Mark Lee, M.D. ("Dr. Lee"), to review Jones' records, and Dr. Lee found it unlikely that the accident caused Jones' death.  However, Dr. Lee could not be certain about the cause of death, and Scottsdale sent Jones' medical records to a cardiologist for further review.  Before Scottsdale received the cardiologist's report, it settled the claim and the cardiologist was not asked to issue a formal written report.  However, it appears that the cardiologist's initial assessment would have been that Jones' death was not caused by the accident.  Defendants argue that Scottsdale's failure to wait for the cardiologist's report is additional evidence that Scottsdale acted unreasonably by settling the claim.

## II.

Defendants ask the Court to reconsider its opinion and order (Dkt. # 69) denying defendants' motion to amend their answer and file counterclaims.  Defendants previously requested leave of court to amend their answer to add counterclaims for breach of contract and bad faith against Scottsdale.  The Court denied defendants' motion to amend on the basis of undue delay, because the case was over a year and a half old and plaintiff would be prejudiced by defendants' delay in seeking to amend their answer.  Dkt. # 69, at 4-7.

The Court treats defendants' motion to reconsider under Fed.R.Civ.P. 54(b), as the underlying order is not a final order or judgment. See Raytheon Constructors, Inc. v. Asarco Inc., 368 F.3d 1214, 1217 (10th Cir. 2003). Defendants' motion does not discuss the standard of review for motions to reconsider, but their motion implies that the Court should reconsider its opinion and order under a de novo standard.  The Court may, however, call into play the legal standards applicable to a Rule 59(e) motion to alter or amend judgment. See e.g., Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP, 322 F.3d 147, 167 (2d Cir. 2003). A motion to reconsider, like a motion to alter or amend judgment, should be granted only upon the following grounds: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000); see also Adams v. Reliance Standard Life Ins. Co., 225 F.3d at 1186 n.5 (10th Cir. 2000).  The Court will exercise its discretion to review defendants' motion to reconsider under the standards applicable to Rule 59(e) motions.

Under the Rule 59(e) standards, defendants have not provided any basis for the Court to reconsider its decision to deny their motion to amend.  Defendants claim that they did not discover the claims adjustor's notes or a December 13, 2005 letter from Scottsdale to Jones' estate until September 10, 2007 due to the lack of diligence shown by their previous attorneys. Defendants' late "discovery" of the claims adjustor's notes and the December 13, 2005 letter does not provide a basis for reconsideration.  This simply shows that defendants did not conduct discovery in a timely fashion.  It does not change the Court's conclusion that defendants' motion to amend should be denied due to undue delay and, in fact, defendants' lack of due diligence in pursuing discovery supports the Court's finding of undue delay.

6

Defendants ask the Court to excuse their belated effort to amend their complaint, because previous counsel did not diligently work on defendants' case and defendants had a difficult time obtaining counsel after the Court permitted the firm of Frasier, Frasier & Hickman, LLP, to withdraw.  They imply that the Court is responsible for defendants' delay in filing a motion to amend because the Court allowed their attorney to withdraw. Dkt. # 71, at 8 (describing the Court's criticism of defendants' delay "unfair" because the Court permitted previous defense counsel to withdraw).  Defendants, not their attorneys or the Court, are responsible for their defense, and their attempt to shift the blame does not excuse the lengthy delay caused by defendants' actions.[4] Reconsideration is "not available to allow a party to reargue an issue previously addressed by the court when the reargument merely advances new arguments or supporting facts which were available for presentation at the time of the original argument." FDIC v. United Pacific Ins. Co., 152 F.3d 1266, 1272 (10th Cir. 1998) (quoting Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)).   In its previous opinion and order, the Court considered defendants' argument concerning the inaction of their previous attorneys, but rejected it as a basis to excuse defendants's delay in filing a motion to amend.  Dkt. # 69, at 7 ("Attorney oversight is not a sufficient basis to excuse defendants' lengthy delay to amend their answer or add counterclaims, especially when the counterclaims are based on evidence that has been in defendants' possession throughout the lawsuit.").   Defendants may not simply reurge previously rejected arguments as a basis for reconsideration, and the Court will not reconsider its denial of defendants' motion to amend based

---

[4]     The Court notes that previous counsel was permitted to withdraw because defendants would not communicate with their attorney. Dkt. ## 36, 37.  Although the Court permitted previous defense counsel to withdraw, the record shows that defendants' failure to communicate with their attorney was the underlying cause of any delay.

7

on the alleged inaction of defendants' previous attorneys.  The Court finds that defendants have not stated a legitimate basis for reconsideration, and their motion to reconsider should be denied.[5]

### III.

Scottsdale asserts that it is entitled to reimbursement for the full amount it paid to settle the claims of Jones' estate against OTA and moves for summary judgment on this issue.  Scottsdale argues that the clear intent of Form F is to provide the insurer a right to reimbursement when it pays a claim based on liability incurred under Form F only.  Scottsdale asks the Court to compare Form F to federal form MCS-90 promulgated by the Interstate Commerce Commission, because the regulatory purpose and language of MCS-90 closely track Form F.  Defendants respond that Form F requires the insured to agree before the insurer acquires a right to reimbursement, because the phrase "provided only that" implies that the insured must consent to reimbursement under the Policy.  In the event the Court concludes that Form F does provide the insurer a right to reimbursement, defendants have raised several affirmative defenses to enforcement of the reimbursement provision.

### A.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates

---

[5]     Defendants' remaining argument concerning the merits of their proposed counterclaims does not provide a basis for reconsideration because, as the Court will discuss below, defendants' interpretation of the Policy is not supported by the plain language of the Policy or judicial precedent.  See infra, III(A).

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## B.

This case requires the Court to construe a disputed provision of an insurance policy. Under Oklahoma law, an insurance contract should be construed according to the terms set out within the four corners of the document. First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1173 (10th Cir. 2005); Redcorn v. State Farm Fire & Cas. Co., 55 P.3d 1017,

1020 (Okla. 2002); <u>London v. Farmers Ins. Co., Inc.</u>, 63 P.3d 552, 554 (Okla. Civ. App. 2002).  If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties."  <u>Roads West, Inc. v. Austin</u>, 91 P.3d 81, 88 (Okla. Civ. App. 2004).  A court should not create an ambiguity in the policy by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision."  <u>Wynn v. Avemco Ins. Co.</u>, 963 P.2d 572, 575 (Okla. 1998).  A policy term will be considered ambiguous only if it susceptible to more than one reasonable interpretation.  <u>Max True Plastering Co. v. U.S. Fidelity & Guar. Co.</u>, 912 P.2d 861, 869 (Okla. 1996).  If an insurance contract contains an ambiguous term, the Court may refer to extrinsic evidence to interpret the insurance policy.  <u>Gable, Simmons & Co. v. Kerr-McGee Corp.</u>, 175 F.3d 762, 767 (10th Cir. 1999) (citing <u>Pierce Couch Hendrickson Baysinger & Green v. Freede</u>, 936 P.2d 906, 912 (Okla. 1997)).  When construing an ambiguous term in an insurance contract, a court must consider "not what the drafter intended . . . but what a reasonable person in the position of the insured would have understood [the ambiguous provision] to mean."  <u>American Economy Ins. Co. v. Bogdahn</u>, 89 P.3d 1051, 1054 (Okla. 2004).

The disputed provision of the insurance contract is referred to as Form F, and it is a uniform document used by many insurance companies across the country to comply with state law compulsory insurance requirements for motor carriers.  In relevant part, Form F provides:

> The certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction with respect thereto, amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby; <u>provided only that</u> the insured agrees to reimburse the company for any payment made by the company which it would not have been

obligated to make under the terms of this policy except by reason of the obligation assumed in making such certification.

Dkt. # 74, Ex. 7 (emphasis added).  The purpose of state compulsory insurance laws and Form F is to protect members of the public who have been injured by the negligent acts of a motor carrier even if the vehicle involved in an accident is not covered under the motor carrier's insurance policy. Driskell v. Empire Fire & Marine Ins. Co., 547 S.E.2d 360, 365 (Ga. App. 2001); American Nat'l Ins. Co. v. Levy, 594 N.Y.S. 2d 118 (N.Y. Sup. Ct. 1992).  Form F serves as a "guarantee to the public that the insurer will be liable for any damages awarded if the insured is unable to pay." Ross Neely Systems, Inc. v. Occidental Fire & Cas. Co. of North Carolina, 196 F.3d 1347, 1351 (11th Cir. 1999); see also Lancer Ins. Co. v. Shelton, 245 Fed. Appx. 355, 358 (5th Cir. 2007) (noting that Form F exists "to ensure that liability insurance is always available for the protection of motorists injured by commercial motor carriers"); Kolencik v. Progressive Preferred Ins. Co., 2006 WL 738715, *4 (N.D. Ga. Mar. 17, 2006) ("The purpose of this insurance 'is not for the benefit of the insured [motor common carrier] but for the sole benefit of those who may have a cause of action for damages for the negligence of the motor common carrier'").

The parties have spent a great deal of time briefing the meaning of "provided only that" as used in Form F, but both parties misunderstand the importance of this phrase.  Scottsdale simply ignores this language and defendants engage in a lengthy analysis in attempt to show that they had to agree to reimburse Scottsdale before a right to reimbursement arose.  The Court finds that the meaning of Form F is clear and unambiguous, and there is no need to refer to other sources to interpret the plain language of the insurance contract. Grammatically speaking, "provided only that" modifies the liability rather than the right to reimbursement, and the use of "provided only that" does not limit or impair the insured's duty to reimburse Scottsdale for liability arising solely under Form

11

F.[6]  Form F is a standard form used by insurance companies across the country, and every court to consider the issue has found that Form F permits the insurer to seek reimbursement from the insured for liability arising solely under Form F.  Driskell., 547 S.E.2d at 364; Nat'l Cas. Co. v. Lane Express, Inc., 998 S.W.2d 256 (Tex. App. 1999); Rural Mut. Ins. Co. v. Peterson, 395 N.W.2d 776, 779 (Wis. 1986).  The plain language of Form F permits Scottsdale to seek reimbursement from its insured for liability arising solely under state law compulsory insurance requirements.

This result is supported by Oklahoma and Tenth Circuit precedent interpreting Oklahoma's compulsory liability insurance statute for commercial motor carriers.  Oklahoma requires a motor carrier to file a liability insurance policy or bond "covering public liability and property damage . . . in such sum and amount as fixed by a proper order of the [Oklahoma Corporation Commission]."  OKLA. STAT. tit. 47, § 169(A).  To comply with § 169, a motor carrier is required to file a Form E endorsement with the Oklahoma Corporation Commission as evidence that the motor carrier has obtained the appropriate amount of liability insurance.  Although § 169 may require an insurer to cover claims falling outside of the liability insurance policy, the parties may agree to limit the insurer's liability falling solely under § 169 by including a reimbursement provision.  Bennett v. The Preferred Acc. Ins. Co. of New York, 192 F.2d 748 (10th Cir. 1951) (reimbursement provision provided a tangible benefit to the insurer and the insured, because insurer could seek reimbursement for liability incurred solely under § 169 and reduce the insured's premium for liability insurance); Tri-State Ins. Co. v. Hobbs, 347 P.2d 226 (Okla. 1959) ("An agreement by an insured to reimburse his insurer for payments which the insurer is required to make which it would not have been

---

[6]      It is not necessary to consider plaintiff's comparison to the federal MCS-90 endorsement, because the plain language of Form F compels OTA to reimburse Scottsdale.

obligated to make but for the Corporation Commission's regulations which enlarged the policy to cover third persons and the public, is valid."). Form F permits the insurer to seek reimbursement for its liability arising solely under Oklahoma's compulsory insurance statute and, since the parties bargained for this right, the Court may not ignore the plain language of the Policy. Braun v. Annesley, 936 F.2d 1105, 1109 (10th Cir. 1991) ("The Oklahoma compulsory insurance laws, however, do not 'regulate the relations between the insurer and the insured.'"); Bennett, 192 F.2d at 750-51 (the parties to the insurance contract bargained for a reimbursement provision and "courts may not rewrite the contract" to invalidate the insurer's right to reimbursement).

Defendants argue that Form F requires Scottsdale to obtain the insured's consent before it has a right to seek reimbursement from the insured. However, defendants' interpretation of Form F is not supported by the plain language of the Policy or judicial precedent. They argue that the insurer's right to reimbursement does not arise unless the insured agrees to reimbursement before the insurer settles a claim because, if the law were otherwise, an insurer could "take a blank check from the insured's checkbook and write it for any amount it wants regardless of all other facts or circumstances." Dkt. # 78, at 9. However, this interpretation of Form F would allow defendants to reap the benefits of insurance coverage for uninsured vehicles without incurring any obligation to the insurer. Form F balances the obligations of the insurer against the interests of the public, and requires an insurer to pay claims arising out of the use of uninsured vehicles operated by motor carriers. Ross Neely Systems, 196 F.3d at 1351. Although the insurer is required to provide coverage for uninsured vehicles, this duty is offset by the insurer's right to seek reimbursement from the insured. The insurer's right to reimbursement would be meaningless if this right was subject to

13

approval by the insured, because it is doubtful that an insured would ever voluntarily reimburse an insurer for amounts paid to settle a claim pursuant to Form F.[7]

Form F unequivocally requires OTA to reimburse Scottsdale for liability arising solely under § 169, and the reimbursement provision is enforceable under Oklahoma law. The Court will consider defendants' affirmative defenses separately, but the plain and unambiguous language of the Policy authorizes Scottsdale to seek reimbursement from its insured for liability arising solely under Form F.

## C.

Even if Scottsdale has a right to reimbursement under Form F, defendants have raised several affirmative defenses which they claim preclude Scottsdale from obtaining reimbursement in this case. Defendants assert that Scottsdale (1) breached the Policy and implied promises in a December 1, 2005 letter to defendants; (2) acted in bad faith by settling the claims against OTA; and (3) failed to mitigate its damages. Scottsdale responds that the Policy authorized it to settle claims within Policy limits without consulting defendants, and the December 1, 2005 letter did not contain any implied promises altering the relationship between Scottsdale and its insured.

The Court's finds that Scottsdale did not breach the Policy or any implied promises in the December 1, 2005 letter by settling the wrongful death claim against OTA, because the Policy provides Scottsdale discretion to resolve claims against its insured for amounts within the Policy

---

[7]    Defendants suggest that their interpretation of Form F is reasonable even if it is assumed that the insured will refuse to reimburse the insurer. Dkt. # 78, at 9. According to defendants, an insurer should be required to litigate a claim if the insured objects to a proposed settlement or the insurer should file a declaratory judgment action against the insured to resolve coverage issues. Both options are potentially expensive and time-consuming and, as the Court will discuss below, neither option is required by the Policy. See infra, III(C).

limits.  Section II(A) of the Policy states that Scottsdale "may investigate and settle any claim or 'suit' as we consider appropriate.  Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgment or settlements."  Dkt. # 74, Ex. 4, at 2.  Karen Cupps executed a non-waiver agreement authorizing Scottsdale to investigate the claims against OTA and engage in settlement negotiations with Jones' estate.  Scottsdale also sent defendants a letter on December 1, 2005 stating:

> The ultimate financial burden is yours.  That being the case, you may want to consider paying this claim now, yourself.  We reserve the right to dispose of the claims as we see fit.  If you wish to be notified prior to any settlement, you must so advise in writing.  If we do not receive any written notice, then we reserve the right to settle the claims without prior notice to you, at any time.

Dkt. # 78, Ex. 3, at 4.  Scottsdale notified defendants that they could resolve the claim of Jones' estate themselves but, if they did not contact Scottsdale, it reserved its right under the Policy to dispose of the claim.  Defendants treat this as an affirmative promise by Scottsdale to wait for a response from defendants before settling the case.  However, neither the Policy nor the letter required Scottsdale to wait for notice from defendants before attempting to settle the claims against OTA.  Consequently, Scottsdale did not breach the Policy or any implied promise in the December 1, 2005 letter by settling the claim on December 13, 2005.

Defendants assert bad faith as a defense to enforcement of the reimbursement provision in the Policy.[8]  The Oklahoma Supreme Court first recognized a cause of action for bad faith against an insurer in Christian v. American Home Assurance Company, 577 P.2d 899 (Okla. 1977).  A

---

[8]    Defendants have not cited, nor can the Court find, any authority suggesting that bad faith can be asserted as a defense to enforcement of an insurance policy.  For the sake of argument only, the Court will consider defendants' argument that an insurer's bad faith can be used an affirmative defense.

necessary part of any bad faith claim is that claimant must show that he has a valid claim under the insurance policy.  <u>Christian</u>, 577 P.2d at 904-05; <u>Phillips v. Oklahoma Farmers Union Mut. Ins. Co.</u>, 867 P.2d 1361, 1363 n.10. (Okla. Civ. App. 1993).  The Oklahoma Supreme Court has stated that "a determination of liability under the contract is a prerequisite to a recovery for bad faith breach of an insurance contract."  <u>Davis v. GHS Health Maintenance Org., Inc.</u>, 22 P.3d 1204, 1210 (Okla. 2001).  In this case, Scottsdale has not breached the Policy or any other promise to the insured and, as a matter of law, it has not acted in bad faith towards its insured.  Scottsdale notified OTA and its officers of a pending claim and, when defendants failed to respond, Scottsdale settled the claim within the Policy limits.  Without evidence that Scottsdale acted unreasonably by settling the claim in the manner it did, defendants can not prevail on a claim or defense of bad faith against Scottsdale, and this does not preclude enforcement of the reimbursement provision of Form F.

Defendants argue that Scottsdale failed to mitigate its damages, because some of the evidence gathered during Scottsdale's investigation raised doubts as to the validity of the wrongful death claim filed by Jones' estate.  Oklahoma law requires "[o]ne who is injured by the acts of another . . . to do that which an ordinary prudent person would do under similar circumstances to mitigate or lessen damages."  <u>Hidalgo Properties, Inc. v. Wachovia Mortgage Co.</u>, 617 F.2d 196, 200 (10th Cir. 1980).  Mitigation of damages is an affirmative defense and defendants bear the burden to produce evidence supporting this defense.  <u>Sabine Corp. v. ONG Western, Inc.</u>, 725 F. Supp. 1157, 1186 (W.D. Okla. 1989); <u>Consolidated Cut Stone Co. v. Seidenbach</u>, 75 P.2d 442, 451 (Okla. 1937); <u>B & B Lines, Inc. v. Ryan Freight Lines, Inc.</u>, 601 P.2d 1207, 1208 (Okla. Civ. App. 1979).

In this case, the evidence shows that Jones' estate initially demanded $385,000[9] to settle its wrongful death claim and Scottsdale settled the case for $250,000. Dkt. # 78, Ex. 5, at 3. Scottsdale's medical experts offered conflicting opinions about the cause of Jones' death and defendants have not shown that the claims of Jones' estate wholly lacked merit. Id. at 2-3. Scottsdale used the conflicting evidence as a bargaining chip to lower the amount of the settlement and, therefore, mitigated its damages. The Court will not permit defendants to relitigate the merits of Jones' estate's wrongful death claim based simply on unsupported allegations that Scottsdale could have settled the claim for less. Defendants have not carried their burden to produce evidence in support of this affirmative defense, and summary judgment against OTA for the full amount of the settlement is appropriate.

## IV.

The final issue before the Court is whether the Cupps may be held personally liable to Scottsdale for the amount of its settlement with Jones' estate.[10] The parties agree that OTA was the named insured under the Policy. The parties do not dispute that OTA's certificate of incorporation was suspended on June 24, 2005, and that Gary and Karen Cupps were officers of OTA. Scottsdale argues that the Cupps are personally liable to Scottsdale because Karen Cupps incurred a debt on behalf of OTA by executing the non-waiver agreement while OTA's certificate of incorporation was suspended. Defendants argue that they should not be held personally liable to Scottsdale, because

---

[9]     In its reply, Scottsdale states that Jones' estate initially demanded $500,000, but there is no evidence in the summary judgment record to support this assertion.

[10]     Both parties have filed a motion for summary judgment on this issue. See Dkt. ## 73, 74. As the motions address the same issue and contain overlapping arguments, the Court finds no need to address the motions separately.

they did not consent to the settlement with Jones' estate and, thus, lacked knowledge of a debt incurred on behalf of OTA.

> Under Oklahoma law,
>
> (c) Each trustee, director or officer of any such corporation, association or organization, whose right to do business within this state shall be so forfeited, shall, as to any and all debts of such corporation, association or organization, which may be created or incurred with his knowledge, approval and consent, within this state after forfeiture and before the reinstatement of the right of such corporation to do business, be deemed and held liable thereon in the same manner and to the same extent as if such trustees, directors, and officers of such corporation, association or organization were partners.

OKLA. STAT. tit. 68, § 1212.  The legislative intent of this statute was to prevent a suspended corporation from doing business in Oklahoma during the period of suspension.  K.J. McNitt Constr., Inc. v. Economopoulos, 23 P.3d 983 (Okla. Civ. App. 2001).  If a corporation's charter is reinstated, any trustee, director or officer who personally incurred a debt under § 1212(c) remains liable for the debt.  State Ins. Fund v. AAA Engineering & Drafting, Inc., 863 P.2d 1218, 1221 (Okla. 1993); Kearney v. Williams, 946 P.2d 273 (Okla. Civ. App. 1997).  A corporate officer can not be held personally based on imputed knowledge of a debt only, but he or she must have actual knowledge of a debt.  Brown Oil Co. v. Shipley, 706 P.2d 173, 176 (Okla. Civ. App. 1985).  "Whether a director has approved and consented to the debt would be then determined by his acts after gaining knowledge of the debt."  Id.

At the time Karen Cupps executed the non-waiver agreement, OTA's certificate of incorporation was suspended and any action she took on behalf of OTA was attributable to her

personally.[11]  The plain language of the non-waiver agreement shows that Karen Cupps authorized

Scottsdale to settle the claims against OTA:

> It is the desire of the insured, notwithstanding the company's disclaimer of
> obligation under its said policy, that the company shall proceed with the
> investigation of said accident or loss, ascertaining of damages or amount of loss,
> negotiations for settlement of damage claims arising there from (if the company
> deems such negotiations advisable), defense of any suit or suits against the insured
> upon such claims for damages, appeal from any judgment or judgments rendered
> against the insured in such suit or suits -- any or all of such steps to be taken by the
> company without prejudice to the disclaimer of liability now asserted.

Dkt. # 74, Ex. 8, at 1.  This agreement authorized Scottsdale to negotiate a settlement, defend against

the lawsuit by raising appropriate defenses on behalf of the insured and, in the event of an adverse

judgment, file an appeal.  The agreement also notified Karen Cupps that Scottsdale was reserving

its rights under the policy and, as the Court has discussed, this included Scottsdale's right to

reimbursement if it was required to pay a claim against OTA based on liability arising solely out of

Scottsdale's obligations to the public under Form F.  The Court finds that Karen Cupps knowingly

incurred a debt on behalf of OTA by authorizing Scottsdale to resolve the lawsuit filed by Jones'

estate, and she can be held personally liable for the debt.

Scottsdale impliedly argues that Gary Cupps should also be held personally liable based on

Karen Cupps' execution of the non-waiver agreement.  Karen Cupps signed the non-waiver

agreement on behalf of OTA and, by so doing, she incurred a personal debt due to the legal status

---

[11]     Karen Cupps argues that she did not read the non-waiver agreement before signing it and she
did not realize that she was authorizing Scottsdale to settle any claims against OTA.
However, this is not a valid defense under Oklahoma law unless a person signing a contract
can show that she lacked the ability to read and understand the contract.  Ely Walker Dry
Goods Co. v. Smith, 160 P. 898, 900 (Okla. 1916); Green Tree Acceptance, Inc. v.
Anderson, 981 P.2d 804, 808 (Okla. Civ. App. 1999).  Consequently, Karen Cupps assertion
that she did not read the non-waiver agreement is irrelevant.

of OTA.  There is no indication in the non-waiver agreement that she was authorized to act on behalf of Gary Cupps personally, and Gary Cupps has submitted an affidavit stating that he was not aware of the non-waiver agreement until he received a letter from Scottsdale on December 1, 2005.  Dkt. # 91, Ex. 1, at 1.  Section 1212(c) imposes personal liability on "each trustee, director or officer" who "created or incurred with his knowledge, approval and consent" a debt of behalf of a suspended corporation.  OKLA. STAT. tit. 68, § 1212(c).  The statute does not impose joint liability on all directors or officers of a corporation but, instead, imposes liability on a corporate officer or director who had knowledge of or permitted a corporation to incur a debt during a period of suspension.  See Brown Oil Co., 706 P.2d at  176.  Consequently, Scottsdale must show that Gary Cupps had actual knowledge of a debt incurred by OTA while its right to do business was suspended and that he consented to the debt.  Puckett v. Cornelson, 897 P.2d 1154, 1156 (Okla. Civ. App. 1995) ("§ 1212 conditions personal liability of a corporate officer and shareholder on such corporate officer and shareholder's actual knowledge of the debt or approval/condonation thereof").

Scottsdale sent a letter to Gary Cupps on December 1, 2005 notifying him that OTA would be required to reimburse Scottsdale for any settlement paid to Jones' estate.  The letter stated:

> You are hereby notified that [Scottsdale], in investigating this loss or any claim arising therefrom, or in negotiating for a compromise settlement, or in making any settlement, or in defending any lawsuit against you or others, or in any way acting or failing to act, does not waive any its rights or admit any obligations under the policy.
>
> .          .          .
>
> The acceptance of the service of this notice of reservation upon you shall not be taken as a waiver of any of your rights under the policy.  You are invited to retain counsel, at your own expense, to protect your interests.

Dkt. # 78, Ex. 3, at 4.  In his affidavit, Gary Cupps acknowledges that he received this letter and was aware of the wrongful death claim against OTA.  Dkt. # 91, Ex. 1, at 1.  The letter put Gary Cupps on notice that Scottsdale would seek reimbursement for any amount paid to settle the claim of Jones' estate.  Dkt. # 78, Ex. 3, at 4.  Gary Cupps faxed a letter to Scottsdale on December 15, 2005 stating that he "would like to be advised of any and all settlement offers before any settlement occurs."  Id. at 6.  However, Scottsdale had already settled the case on December 13, 2005.  On December 15, 2005, the settlement agreement was executed and Jones's estate released its claims against Whitecotton, Gary Cupps, and OTA in exchange for $250,000.  Dkt. # 82, Ex. 2.  Gary Cupps admits that he received a letter from Scottsdale, dated December 16, 2005, notifying him of the settlement, and there is no evidence that he took any further action concerning the wrongful death claim against OTA.  Dkt. # 91, Ex. 1, at 2.

The evidence shows that Gary Cupps had knowledge of a wrongful death claim against OTA and he did not take timely action to prevent Scottsdale from settling the claim without his consent. It is also clear that defendants received the benefit of the settlement, because Jones' estate agreed to dismiss its claims against OTA and Gary Cupps with prejudice.  If a corporate officer obtains knowledge of a debt through the regular course of business, he may be found to consent or approve a debt for purposes of § 1212 if the opposing party offers "proof that a director took no action after having knowledge of a debt [that] would be sufficient to show that he has approved and consented." Dobry v. Wayne, 737 P.2d 583, 584 (Okla. Civ. App. 1987) (quoting Brown Oil Co., 706 P.2d at 176).  In this case, Gary Cupps had knowledge of a claim against OTA and he was put on notice that Scottsdale would seek reimbursement from OTA before Scottsdale settled the claim against OTA. By permitting Scottsdale to settle the claim and by failing to object after he learned of the settlement,

21

Gary Cupps' inaction shows that he had knowledge of and consented to a debt on behalf of OTA. Pursuant to § 1212, Scottsdale may seek to collect on its judgment against Gary and Karen Cupps personally.

**IT IS THEREFORE ORDERED** that Opposed Motion to Reconsider Defendants' Motion to Amend Their Answer and File Counterclaims (Dkt. # 71) is **denied**.  Defendants' Motion for Partial Summary Judgment and Brief in Support (Dkt. # 73) is **denied**.  Plaintiff, Scottsdale Insurance Company, Inc.'s, Motion for Summary Judgment and Brief in Support (Dkt. # 74) is **granted**.

**IT IS FURTHER ORDERED** that counsel for plaintiff shall submit a proposed judgment, approved as to form by defendant, to the CM/ECF Intake Box as a Word Perfect document no later than **April 3, 2008**.

**DATED** this 28th day of March, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT